USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/21/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                 :

OHIO SECURITY INSURANCE COMPANY,   :
                                 :

                      Plaintiff,   :          1:24-cv-8088-GHW
                                 :

        -against-          :        MEMORANDUM
                                 :        OPINION & ORDER

SELECTIVE INSURANCE COMPANY OF THE :
SOUTHEAST, *et al.*,              :
                  Defendants.  :

                                 :
-------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

      Gilbert Ramos worked for a drywall contractor—one of several subcontractors working on a construction project. Mr. Ramos set up his ladder in a room littered with cables and pipes left behind by other subcontractors. He fell from the ladder onto the pipes and was injured. Naturally, he sued. He sued the owners of the project and the general contractor that had hired his company (the "Original Defendants"). Ohio Security Insurance Company ("Ohio Security") insured the drywall subcontractor for whom Mr. Ramos worked and agreed to pay for the defense of the Original Defendants, who qualified as "additional insureds" protected by their policy.

      After Mr. Ramos testified that his accident had been caused by electrical cables and pipes left behind by the electrical and plumbing subcontractors working on the project, those subcontractors were added to the litigation as well. Selective Insurance Company of the Southeast ("Selective") and Travelers Casualty Insurance Company of America ("Travelers") agreed to pay for their defense.

      But Selective and Travelers refused to offer a defense to the Original Defendants. They took the position that Mr. Ramos's accident had not been caused by the conduct of their named insureds, and that, therefore, the Original Defendants were not "additional insureds" entitled to a defense under their policies. Selective and Travelers took the position that the third-party complaints filed against their insureds were too conclusory to trigger a duty to defend. Moreover,

they believed that Mr. Ramos's testimony was too inconsistent and uncertain to support a finding that the electricians and plumbers had caused Mr. Ramos's accident.

Because Mr. Ramos's testimony at his deposition that his accident was caused by the trash left behind by the plumbing and electrical subcontractors, there is a reasonable possibility that the Original Defendants are protected as "additional insureds" under the policies issued by Selective and Travelers. The arguments presented by Selective and Travelers that the evidence supporting a finding of liability is weak does not vitiate their duty to defend, for the duty is invoked when there is a reasonable possibility of coverage regardless of the merit of the underlying claim. Therefore, Ohio Security's motion for declaratory judgment that Selective and Travelers must contribute to the defense of the Original Defendants is GRANTED.

## I.    BACKGROUND

### A.    Facts[1]

#### 1.    The Construction Project and the Contractors

This case involves a construction project located at 10 School Street in Yonkers, New York (the "Project"). Dkt. No. 54-1 ("Selective 56.1 Response") ¶ 12[2]; Dkt. No. 43 ("Joint Decl.") Ex. M. School Street Housing Development Fund Corp. ("School Street") and 10-28 Yonkers L.P. ("10-28 Yonkers") were the owners of the property.

School Street and 10-28 Yonkers contracted with Mountco Construction and Development Corp. ("Mountco") to serve as the general contractor on the Project. Joint Decl. Ex. M. Mountco, in turn, entered into subcontracts with several subcontractors to perform work on the Project. Three of those subcontractors are relevant to this case. The first is Jan Construction Services Corp.

---

[1] The facts are taken from the parties' Local Rule 56.1 statements and other documents submitted in connection with the parties' summary judgment motions. Unless otherwise stated, the facts are undisputed by the parties.
[2] The parties presented three separate motions for summary judgment, each of which was accompanied by its own 56.1 statement of material facts. For ease of reference, the Court cites principally to the 56.1 statement filed by Plaintiff and Defendant Selective's response to it. The undisputed facts referenced in this 56.1 statement are supported by the factual record presented to the Court in connection with each of the other motions for summary judgment.

("Jan").  Jan was contracted to perform sheet rocking and demolition work at the project.  Joint

Decl. Ex. BB ("Jan Subcontract").  Gilbert Ramos, whose accident while working on the Project

sparked this litigation, was employed by Jan.  The second subcontractor at issue in this case is J&S

Mechanical, Inc. ("J&S").  J&S was contracted to do plumbing work on the Project.  Joint Decl. Ex.

N ("J&S Subcontract").  And the third contractor is C. Williams Electrical Construction, Inc.

("Williams").  Williams was contracted to perform electrical work on the Project.  Joint Decl. Ex. O

("Williams Subcontract").

Jan, J&S and Williams entered into nearly identical form subcontracts with Mountco.  The

subcontracts contained similar language imposing obligations on J&S and Williams to obtain

insurance coverage for the owners of the project and the general contractor.  Exhibit B of the

Williams Subcontract required that Williams obtain coverage for School Street, 10-28 Yonkers and

Mountco as "additional insureds" under its insurance policy.  Williams Subcontract Ex. B; Selective

56.1 Response ¶ 54.  The Court understands that the Jan and J&S Subcontracts contained the same

requirement.[3]

Their subcontracts also required Jan, J&S and Williams to clean and maintain their worksites.

Each subcontract required the subcontractor to "take reasonable safety precautions with respect to

performance of this Subcontract . . . ."  J&S Subcontract § 4.3; Williams Subcontract § 4.3; Jan

Subcontract § 4.3.  Each subcontractor also agreed "that the prevention of accidents to workmen

engaged upon or in the vicinity of the Work is its responsibility."  J&S Subcontract § 4.4; Williams

Subcontract § 4.4; Jan Subcontract § 4.4.  And Section 4.5 of each subcontract required the

subcontractors to keep the areas where they worked clean:  "The Subcontractor shall keep the

premises and surrounding area free from accumulation of waste materials or rubbish caused by

---

[3] The parties did not submit Exhibit B to either the J&S Subcontract or the Jan Subcontract to the Court, but those subcontracts are based on the same form as the Williams Subcontract and likewise refer to an "Exhibit B Insurance Requirements."

operations performed under this Subcontract." J&S Subcontract § 4.5; Williams Subcontract § 4.5; Jan Subcontract § 4.5.

### 2.    The Insurance Contracts

Each of the subcontractors had insurance policies that covered School Street, 10-28 Yonkers and Mountco as "additional insureds." The relevant terms of each of those policies are outlined below.

### a.    The Policy Issued by Selective to Williams

Selective Insurance Company of the Southeast ("Selective") issued a commercial lines policy to Williams as the named insured. Joint Decl. Ex. W (the "Selective Policy"). The policy period ran from October 2, 2020, to October 2, 2021. The policy obligated Selective to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." *Id.* at SELECTIVE_000213. Selective assumed a duty to defend its insured: "We will have the right and duty to defend the insured against any 'suit' seeking those damages even if the allegations of the 'suit' are groundless, false or fraudulent." *Id.*

The Selective Policy contains a General Liability Extension Endorsement that contains an additional insured provision that provides, in part, as follows:

> Subject to the **Primary and Non-Contributory** provision set forth in this endorsement, **SECTION II – WHO IS AN INSURED** is amended to include as an additional insured:
>
> **A. Owners, Lessees or Contractors/Architects, Engineers and Surveyors**
>
> **1.** Any person or organization for whom you are performing operations when you and such person or organization have agreed in a written contract, written agreement or written permit that such person or organization be added as an additional insured on your commercial general liability policy; and
>
> **2.** Any other person or organization, including any architects, engineers or surveyors not engaged by you, whom you are required to add as an additional insured under your policy in the contract or agreement in Paragraph **1.** above:

Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" *caused, in whole or in part*, by:

**a.** Your acts or omissions; or

**b.** The acts of omissions of those acting on your behalf; in the performance of your ongoing operations performed for the additional insured in Paragraph **1.**, above.

*Id.* at SELECTIVE_000225–226 (emphasis added).

The Selective Policy contains a separate additional insured provision that provides, in part, as follows:

**1. BLANKET ADDITIONAL INSUREDS**

**a.   Ongoing Operations**

**SECTION II – WHO IS AN INSURED** is amended to include as an additional insured:

**1.** Any person or organization for whom you are performing operations when you and such person or organization have agreed in a written contract, written agreement or written permit that such person or organization be added as an additional insured on your commercial general liability policy; and

**2.** Any other person or organization, including any architects, engineers or surveyors not engaged by you, whom you are required to add as an additional insured under your policy in the contract or agreement in Paragraph **1.** above;

Such person or organization is an additional insured only with respect to liability arising out of your ongoing operations performed under that contract, agreement, or permit when that contract, agreement, or permit requires the additional insured be added with respect to the liability arising out of your ongoing operations.  If the written contract, written agreement, or written permit does not require that the additional insured be added with respect to liability arising out of your ongoing operations, then such person or organization is an additional insured only with respect to "bodily injury", "property damage" or "personal and advertising injury" caused in whole or in part by your ongoing operations performed under that contract, agreement, or permit.

*Id.* at SELECTIVE_000232.

The Selective Policy contains an "Other Insurance" provision that provides, in part, as follows:

### a. Primary Insurance

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

*Id.* at SELECTIVE_000207.

### b.    The Policy Issued by Travelers to J&S

Travelers Casualty Insurance Company of America ("Travelers") issued a commercial lines policy to J&S as the named insured. Joint Decl. Ex. X (the "Travelers Policy"). The policy period ran from June 29, 2021, to June 29, 2022. The policy obligated Travelers to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." *Id.* at TRV00124. Travelers assumed a duty to defend its insured: "We will have the right and duty to defend the insured against any 'suit' seeking those damages." *Id.*

The Travelers Policy contains an endorsement entitled "Blanket Additional Insured," which includes an additional insured provision. That provision reads, in part, as follows:

**PROVISIONS**

The following is added to **SECTION II – WHO IS AN INSURED**:

Any person or organization that you agree in a written contract or agreement to include as an additional insured on this Coverage Part is an insured, but only:

**a.** With respect to liability for "bodily injury" or "property damage" that occurs, or for "personal injury" caused by an offense that is committed, subsequent to the signing of that contract or agreement and while that part of the contract or agreement is in effect; and

**b.** If, and only to the extent that, such injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the written contract or agreement applies. Such person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

6

*Id.* at TRV00148.

The Travelers Policy contains an "Other Insurance" provision that provides, in part, as follows:

### a.  Primary Insurance

This insurance is primary except when Paragraph **b.** below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in Paragraph **c.** below, except when paragraph **d.** below applies.

### b. Excess Insurance

**(1)** This insurance is excess over:

\* \* \*

**(b)** Any of the other insurance, whether primary, excess, contingent, or on any other basis, that is available to the insured when the insured is an additional insured, or is any insurance that does not qualify as a named insured, under such other insurance.

*Id.* at TRV00138.

### c.    The Policy Issued by Ohio to Jan

Ohio Security Insurance Company ("Ohio Security") issued a commercial lines policy to Jan with a policy period that ran from October 3, 2020 to October 3, 2021.  Joint Decl. Ex. P ("Ohio Security Policy").  There is no dispute in this case about the scope of the Ohio Security Policy.  However, because Ohio Security has raised an issue regarding the priority of its policy relative to the Selective and Travelers Policies, the Ohio Security Policy's "Other Insurance" policy is relevant to the resolution of this dispute.

The Ohio Security Policy contains an applicable excess "Other Insurance" provision, which provides, in part, as follows:

Regardless of the written agreement between you and an additional insured, this insurance is excess over any other insurance whether primary, excess, contingent or on any other basis for which the additional insured has been added as an additional insured on other policies.

*Id.* at OHIO 00097.

### 3.    The Underlying Action

This case was provoked by a lawsuit filed by Mr. Ramos (the "Underlying Action"). Mr. Ramos was working for Jan putting up drywall at the Project. The ladder on which he was working collapsed. And when Mr. Ramos fell, he hurt his back.

As a result, Mr. Ramos first sued School Street in New York Supreme Court in the Bronx. In January 2022, he filed an amended complaint adding Mountco as a defendant. Selective 56.1 Response ¶ 10. He amended the complaint again in November 2022 to add 10-28 Yonkers as a defendant. *Id.* ¶ 11. In his lawsuit, Mr. Ramos alleged that he was injured as a result of the conduct of School Street, 10-28 Yonkers and Mountco (collectively, the "Original Defendants")—according to Mr. Ramos, they breached statutory duties and acted negligently in a way that caused his injury. *Id.* ¶¶ 16, 17.[4]

On April 7, 2022, Mountco impleaded Jan, Mr. Ramos's employer, into the Underlying Action by filing a third-party complaint against Jan. *Id.* ¶ 18. In the third-party complaint, Mountco alleges that because of Jan's negligence, Mountco was exposed to the liability asserted against it in the Underlying Action. *Id.* ¶ 21. The third-party complaint asserts three causes of action against Jan

---

[4] The allegations regarding the conduct of each defendant that led to Mr. Ramos's alleged injuries were described in broad brush in his amended complaint. Joint Decl. Ex. C ¶¶ 40, 64, 86 ("That the defendant, its agents, servants and/or employees were negligent, reckless and careless in the ownership, operation, repair, control, possession, supervision, direction, construction, inspection, management, renovation, rehabilitation and/or alteration of the said premises *in that they failed to provide the plaintiff with a safe place to work; failed to provide the plaintiff with a hazard-free work place; failed to provide the plaintiff with proper and safe elevated working surfaces,* scaffolds and ladders, so fixed, secured and/or maintained and braced so as to prevent the plaintiff from falling from same; failed to provide the plaintiff with proper and approved safety devices so placed, fixed and/or secured so as to afford proper protection to the plaintiff working thereat; violated the applicable provisions of the Labor Law of the State of New York, the Industrial Code of the State of New York and the provisions of the Occupational Safety & Health Administration as they pertain to construction; failed to inspect the work areas on the date of the accident and prior thereto to see that the elevated working surfaces, scaffolds and ladders were safe; and, failed to provide the plaintiff with any safety devices to prevent plaintiff from falling from said elevated working surfaces, scaffolds and ladders.") (emphasis added).

for contractual and common law indemnity, contribution, and breach of contract for failure to procure liability insurance. *Id.* ¶ 22.

Years later, on March 6, 2024, the Original Defendants impleaded Williams into the Underlying Action. Selective 56.1 Response ¶ 23.[5] The third-party complaint filed by the Original Defendants against Williams asserted that if Mr. Ramos was injured, his injuries were the result of negligent acts by Williams. Joint Decl. Ex. E ("Williams Complaint"). The third-party complaint asserted four causes of action against Williams, sounding in negligence, contribution, contractual and common law indemnity, and breach of contract. The complaint laid out a description of the Underlying Action. Williams Complaint. ¶¶ 3–17. It described the fact that Williams was a subcontractor to Mountco on the Project. *Id.* ¶ 18. But it provided only the following allegations regarding the conduct of Williams:

> If Plaintiff recovers herein against the answering Defendants/Third-Party Plaintiffs, SCHOOL STREET, YONKERS, and MOUNTCO, such recovery will have been brought about solely by reason of the active negligence, carelessness, recklessness and wrongdoing of Third-Party Defendant, C. WILLIAMS ELECTRICAL CONSTRUCTION, INC., without any negligence on the part of the Defendants/Third-Party Plaintiffs and in such event Defendants/Third-Party Plaintiffs are entitled to full common law indemnification from Third-Party Defendant, C. WILLIAMS ELECTRICAL CONSTRUCTION, INC.

*Id.* ¶ 20; *see also id.* ¶ 22 (similar as to negligence); *id.* ¶ 24 (similar as to indemnity); *id.* ¶ 26 (similar as to breach of contract).

On June 12, 2024, the Original Defendants impleaded J&S into the Original Action. Selective 56.1 Response ¶ 27. The third-party complaint filed by the Original Defendants against J&S paralleled the language of the Williams Complaint. Like the Williams Complaint, the third-party complaint filed against J&S asserted that if Mr. Ramos was injured, his injuries were the result of

---

[5] By this point, Ohio Security had tendered a defense to School Street, 10-28 Yonkers, and Mountco as additional insureds under the Ohio Security Policy issued to Jan. Dkt. No. 45 ("Holmes Decl.") ¶ 2. Selective and Travelers argue in their submissions that Ohio Security's retained counsel impleaded Williams and J&S, implying that the decision was motivated by a desire to trigger the additional insured coverage under those policies.

negligent acts by J&S.  Joint Decl. Ex. F ("J&S Complaint").  The J&S Complaint asserted four causes of action against J&S, sounding in negligence, contribution, contractual and common law indemnity, and breach of contract.  Also like the Willliams Complaint, the J&S Complaint laid out a description of the Underlying Action and described the fact that J&S was a subcontractor to Mountco on the Project.  *Id.* ¶¶ 3–18.  And like the Williams Complaint, the J&S Complaint contained general allegations regarding the alleged conduct that supported the Original Defendants' claim against J&S:

> If Plaintiff recovers herein against the answering Defendants/Second Third-Party Plaintiffs/Third Third-Party Plaintiffs, SCHOOL STREET, YONKERS, and MOUNTCO, such recovery will have been brought about solely by reason of the active negligence, carelessness, recklessness and wrongdoing of Third Third-Party Defendant, J&S MECHANICAL INC., without any negligence on the part of the Defendants/Third-Party Plaintiffs and in such event Defendants/Third-Party Plaintiffs are entitled to full common law indemnification from Third Third-Party Defendant, J&S MECHANICAL INC.

*Id.* ¶ 20; *see also id.* ¶ 22 (similar as to negligence); *id.* ¶ 24 (similar as to indemnity); *id.* ¶ 26 (similar as to breach of contract).

Discovery commenced in the Underlying Action.  As part of the discovery process, Mr. Ramos served verified bills of particulars on each of the Original Defendants in response to their demands.  Selective 56.1 Response ¶¶ 31–36; Joint Decl. Exs. G, H, I.  In response to a question from each of the Original Defendants, Mr. Ramos provided the following response, presumably detailing the grounds for his claim against them:[6]

> The defendant, its agents, servants and/or employees were negligent, reckless and careless in the operation, maintenance, control, possession, supervision, direction, construction, inspection, renovation, rehabilitation and/or alteration of the said premises in that they failed to provide plaintiff with a safe place to work; failed to provide the plaintiff with a hazard-free work place; in failing to provide the plaintiff with a proper, appropriate and safe ladder, elevated working surface and/or scaffold and/or aerial device and other safety devices so fixed, secured and/or

---

[6] The parties did not provide the Court copies of the demands containing the questions to which the bills of particulars respond.

maintained and braced so as to prevent and/or break plaintiff's fall from a significant height; in failing to provide the plaintiff with proper and approved safety devices so placed, fixed and/or secured so as to afford proper protection to the plaintiff working thereat and to prevent and/or break his fall; in failing to prevent plaintiff from falling and/or in failing to break plaintiff's fall; in failing to provide the plaintiff with safety belts, safety ropes, safety harnesses, life lines, tail lines, safety nets and/or other safety devices necessary to prevent and/or break plaintiffs fall; in failing to provide a safe, secure, and non-slippery surface for the ladder that plaintiff was using at the time of the accident; in failing to ensure that the ladder was secure against movement by physical and/or mechanical means at the time of the accident; in failing to inspect the work areas on the date of the accident and prior thereto to see that said work area contained proper and approved safety devices; in violating the applicable provisions of the Labor Law of the State of New York, the sections of Rule 23 of the Industrial Code of the State of New York, the provisions of ANSI and the sections of the Occupational Safety & Health Administration as they pertain to ladders, safety devices and construction; in failing to inspect the work areas on the date of the accident and prior thereto to see that said ladder was safe; in failing to provide plaintiff with safety devices to prevent the ladder from slipping out from under plaintiff; in failing to provide the plaintiff with a proper surface upon which to place the ladder; in failing to provide the plaintiff with an even and flat surface upon which to place the ladder; in failing to perform proper inspections of the work site to see and remedy the dangerous and defective conditions existing upon said work site; in failing to inspect the ladder and ensure that it had slip resistant pads on the bottom of both rails/feet; in failing to prevent the use of a defective and unsafe ladder; in failing to warn against the use of the defective and unsafe ladder and in failing to remove it from the premises; defendant was negligent in failing to provide readable instructions and warnings; defendant negligently failed to destroy and remove the ladder from the premises; defendant negligently failed to provide a person to hold the ladder; defendant negligently failed to secure the ladder against movement.

Joint Decl. Ex. G (as to School Street); Ex. H (as to 10-28 Yonkers); Ex. I (as to Mountco).

On July 24, 2023, Mr. Ramos appeared for his first deposition in the Underlying Action. In it, he described the events that led to his accident. Joint Decl. Ex. K ("First Deposition"). Mr. Ramos testified that in the morning before his accident, he complained about the condition of the room in which he was to work. First Deposition 83:12–15 ("So that was in the morning when I arrive and I saw that it was dirty and I told him to send someone to clean it and they never sent someone to clean it.").

Mr. Ramos testified that the untidy conditions in the room were a problem.

> Q: Did you have any problems with the ladder before the accident happened?
>
> MR. RAMOS: The problem was that the site where I was working it has -- there was a lot of problems.
>
> Q: What were the problems?
>
> MR. RAMOS: So there was a lot of dirt. The electricians had left cables and the plumbers had left garbage, too. It was a lot. It was a lot of things.
>
> Q: And why was that a problem?
>
> MR. RAMOS: Of course it was a problem. It was a problem because I fell right there. It was a problem.
>
> Q: Well, did you place the ladder on top of the debris?
>
> . . .
>
> MR. RAMOS: I cleaned the space where I was working. I tried to clean it. But any ways I fell.
>
> Q: Okay. Why did you fall?
>
> . . .
>
> MR. RAMOS: So I don't know really. The ladder fell down and I fell on the top of all dirty things. I don't know.

*Id.* 63:10–64:12.

Mr. Ramos described the debris as consisting of electrical cables and tubes. *See, e.g., id.* 67:5–10 ("Q: And what was in the room that you were working on? MR. RAMOS: So there was a sheetrock . . . . The cables and the tubes, the tubes that they left there."). Mr. Ramos's testimony was supported by a photograph, showing the fallen ladder atop a weave of twisted cables alongside an array of tubes. Joint Decl. Ex. L ("Second Deposition"), Ex. C. When he fell, Mr. Ramos fell on top of the tubes that had been left behind. First Deposition 80:19–23 ("Q: And what did you land on; concrete, the concrete floor or something else? MR. RAMOS: I fell on the top of the tubes, the concrete tubes, that they were there.").

On April 29, 2024, Mr. Ramos served a bill of particulars on Williams in response to a demand by Williams in the Underlying Action. Selective 56.1 Response ¶ 37; Joint Decl. Ex. J. In his response, Mr. Ramos included the language quoted above that was included in his response to the bills of particulars issued by the Original Defendants. Here too, the parties failed to provide the Court the questions presented by Williams that provoked Mr. Ramos's response. This is significant because Mr. Ramos—who was responding to Williams's request—had no claims against Williams. As a result, the Court cannot conclude that the response was provided in response to a question regarding the basis for Mr. Ramos's claims against Williams. However, there is no dispute that Williams requested a bill of particulars from Mr. Ramos that was answered by Mr. Ramos's response.

The September 20, 2024 bill of particulars served by Mr. Ramos on J&S has an unusual history. J&S made a demand for a bill of particulars from Mr. Ramos. Joint Decl. Ex. GG. That demand, dated September 4, 2024, contained eight requests. *Id.* The response to the bill of particulars served by Mr. Ramos on J&S is evidently not responsive to J&S's request. Joint Decl. Ex. HH (the "J&S BOP"). It contains 14 responses, which do not align with J&S's eight requests. For example, the first two responses provide Mr. Ramos's date of birth and object to a request for his social security number. J&S BOP. J&S asked for neither of those pieces of information in its demand. One of the responses included in the J&S BOP was a recitation of the same response provided by Mr. Ramos in his responses to the Original Defendants' bills of particulars.

J&S's counsel objected to the J&S BOP provided by Mr. Ramos. Joint Decl. Ex. PP. Mr. Ramos's counsel agreed to withdraw the J&S BOP. Mr. Ramos's counsel later testified that the J&S BOP "was an erroneously served document." Joint Decl. Ex. JJ 13:17–18. On September 9, 2025, Hon. Erik L. Gray issued an order withdrawing that bill of particulars. Joint Decl. Ex. II.

Mr. Ramos returned for a second deposition on April 29, 2025. Second Deposition. In his second deposition, Mr. Ramos again described his complaints about the presence of electrical cables

and other debris on the floor of the location where he was working.  Second Deposition 185:11–15

("I don't know, of course, the name of whoever I complained to.  It was somebody who was in

charge of the building.  I told him that the location was not ready for me to be working there.").

Mr. Ramos testified that:  "Before that, I went and complained with the foreman saying that that

room was not ready for me to work there.  But, you know, I had to get the job done because it

needed to be done."  *Id.* 254:12–16.

Despite the presence of debris on the floor of the room where he was to work, Mr. Ramos

testified, he set up his ladder above the debris.

> MR. RAMOS:  So I don't know how the ladder fell, but I -- you know --
> managed to do my job the best I could.
>
> Q:  So when you say you don't know how the ladder fell, does that mean
> you don't know if there was debris beneath the ladder that caused it to
> fall?
>
> . . .
>
> MR. RAMOS:  So there was tubes or pipes under me, but the ladder has
> four legs.  You figure out how to stand the ladder evenly even though
> those items are there.  It has four legs, you open it up and it opens up
> about six feet wide, so there is not an issue standing the ladder up like
> that.

*Id.* 254:17–255:8.

Mr. Ramos testified that the garbage left behind by the plumbers and others caused his fall.

*Id.* 262:11–16 ("Q:  So my question is this:  Was garbage left by the plumbers one of the problems

that caused you to fall from the ladder?  MR. RAMOS:  Well, yes, that and all the other things that

were there.").

> Q:  So then my question is:  How did you know that the garbage that
> caused you a problem was left by the plumbers?
>
> MR. RAMOS:  Well, basically just because there was pipes there and the
> pipes are used by the plumbers.  That's it.
>
> Q:  So do you know if the ladder fell because it was on top of a pipe left
> by the plumber?

14

MR. RAMOS:  I don't know.

*Id.* 262:17–263:2.

As described above, in his testimony, Mr. Ramos asserted that the electricians and the plumbers had left the materials behind.  *See id.* 258:6–12; 259:24–260:25.  Although Mr. Ramos testified that he fell in an area as a result of problems caused by debris and that the plumbers and electricians had left those materials behind, Mr. Ramos did not know who the electricians or plumbers were—he did not testify that he ever came into contact with them.

### 4.    Selective and Travelers Decline to Defend the Original Defendants

Ohio Security agreed to defend the Original Defendants because they are additional insureds under the policy that Ohio Security issued to Jan.  By letter dated February 14, 2024, Ohio Security tendered the defense for the Original Defendants in the Underlying Action to Selective.  Selective 56.1 Response ¶ 71; Joint Decl. Ex. Q.  Selective responded by letter dated March 11, 2024.  Joint Decl. Ex. R.  Selective pointed to the additional insured language in its policy and concluded that Mr. Ramos's testimony that debris was on the floor where he fell from a ladder was not sufficient to establish coverage.  Selective did not point to any other policy provisions as the basis for its denial of coverage.

On May 6, 2024, Ohio Security also tendered the defense for the Original Defendants in the Underlying Action to Travelers.  Selective 56.1 Response ¶ 75; Joint Decl. Ex. S.  Travelers never responded to the tender letter.  Selective 56.1 Response ¶ 79.

### B.    Procedural History

On October 24, 2024, Ohio Security initiated this action.  Dkt. No. 1.  In its complaint, Ohio Security sought a declaratory judgment that Travelers and Selective have a duty to defend the Original Defendants under their respective policies.  *Id.* ¶¶ 44–49; 55–60.  Ohio sought a declaration that both of those policies apply on a primary basis before coverage under Ohio Security's policy.

*Id.* ¶¶ 49, 60. Ohio Security also sought an award of damages for the amount that it has paid in its defense of the Original Defendants. *Id.* ¶¶ 50–54; 61–65. The parties engaged in discovery until October 2025. Then they moved to the motion practice that is being resolved by this opinion.

On November 19, 2025, each of the parties filed cross-motions for summary judgment. Dkt. Nos. 42, 49, 50. In their motions, the parties principally debate a single question: is there a reasonable possibility that the debris left behind on the Project worksite caused Mr. Ramos's accident and injuries? Ohio Security argues that there is. Ohio Security points to the allegations in the third-party complaints against each of J&S and Williams to support that conclusion. It also argues that the bills of particulars served by Mr. Ramos on those defendants support the conclusion that J&S and Williams are responsible for Mr. Ramos's accident and injury. And Ohio Security argues that Mr. Ramos's deposition testimony in which he stated that the "problems" with the debris contributed to his fall also supports that conclusion.

For their part, Selective and Travelers argue that the allegations in the third-party complaints filed against J&S and Williams are too conclusory to support the conclusion that those entities possibly contributed to Mr. Ramos's accident. They argue that the bills of particulars served by Mr. Ramos have the same flaw. And Travelers argues that the bill of particulars served on J&S by Mr. Ramos is a legal nullity from which no inference should be drawn—because it was erroneously served and later withdrawn. Finally, Selective and Travelers argue that Mr. Ramos's deposition testimony does not suffice, because of its equivocal nature—in particular, the fact that Mr. Ramos testified in one of his depositions that he did not know what the ultimate cause of his accident was. Because the duty to defend is broader than the duty to indemnify, Selective and Travelers argue that the Court should also declare that they have no obligation to indemnify the Original Defendants.

Ohio Security also argued that the Court should grant declaratory judgment regarding the relative priority of its policy with those issued by Travelers and Selective. Dkt. No. 48 ("Ohio Mem.") at 26. Ohio Security argued that Selective's policy "has an applicable primary 'Other

16

Insurance' provision for School Street, 10-28, and Mountco as compared to the Ohio Security

Policy." *Id.* at 27.  On the other hand, Ohio Security argued, both Ohio Security's policy and

Travelers' policy had "an applicable excess 'Other Insurance' provision." *Id.*  As a result, Ohio

Security contended that Selective's policy was primary to the Ohio Security and the Travelers

policies.  The excess "Other Insurance" provisions in the policies issued by Ohio Security and

Travelers "cancel each other out, and Ohio Security and Travelers have a duty to defend School

Street, 10-28, and Mountco on an equal shares basis." *Id.* at 27–28.  Neither Selective nor Travelers

opposed Ohio Security's arguments regarding the relative priority of the policies.

## II.    LEGAL STANDARD

### A.    Motions for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute exists where "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact

is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*

To defeat a motion for summary judgment, the non-movant "must come forward with

'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting former Fed. R. Civ. P. 56(e)).

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."

*Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he or she "may

not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quotation omitted).

Still, "[t]he possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sep. 10, 2013) (quoting *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted).

## B.    The Declaratory Judgment Act

The Declaratory Judgment Act is used frequently to resolve insurance-coverage disputes. *See, e.g., U.S. Specialty Ins. Co. v. Nationwide Mut. Ins. Co.*, No. 19-cv-7884 (MKV), 2020 WL 2489078, at *2 (S.D.N.Y. May 14, 2020) (citing *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d

18

Cir. 1992)).  The Declaratory Judgment Act provides in pertinent part the following:  "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  A federal court may exercise jurisdiction over an action for declaratory judgment only if there "exists . . . an 'actual controversy.'"  *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001) (quoting 28 U.S.C. § 2201(a)).  A justiciable declaratory judgment claim must be "'definite and concrete, touching the legal relations of parties having adverse legal interests,'" as well as "'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, (1937)).

"The Declaratory Judgment Act by its express terms vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not."  *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

> [T]o guide the exercise of discretion in Declaratory Judgment Act cases . . . [the Second Circuit has] articulated a simple test that asks (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.  *See Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969).  Other circuits have built upon this test, to ask also: ([3]) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; ([4]) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and ([5]) whether there is a better or more effective remedy.

*Dow Jones*, 346 F.3d at 359–360 (citations omitted).

Here, there is no dispute regarding the justiciability of this dispute under the Declaratory Judgment Act.  Ohio Security is incurring defense costs as a result of the decision by each of Travelers and Selective to decline coverage.  And there is no question that judgment by the Court

19

regarding the scope of the obligations of Travelers and Selective under their respective policies will "serve a useful purpose" and provide "relief from uncertainty." *Id* at 359.

### C.    The Duty to Defend

Under New York law[7], an insurer's duty to defend is "exceedingly broad." *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006).  "An insurer's duty to defend is liberally construed and is broader than the duty to indemnify, 'in order to ensure [an] adequate . . . defense of [the] insured,' without regard to the insured's ultimate likelihood of prevailing on the merits of a claim." *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 16 N.Y.3d 257, 264 (2011) (quoting *Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.,* 4 N.Y.3d 451, 456 (2005)).

> The inquiry is whether the allegations fall within the risk of loss undertaken by the insured . . . .  The merits of the complaint are irrelevant and, [a]n insured's right to be accorded legal representation is a contractual right and consideration upon which [a person's] premium is in part predicated, and this right exists even if debatable theories are alleged in the pleading against the insured.  An insured's right to representation and the insurer's correlative duty to defend suits, however groundless, false or fraudulent, are in a sense 'litigation insurance' expressly provided by the insurance contract.

*BP Air Conditioning Corp. v. One Beacon Ins. Grp.*, 8 N.Y.3d 708, 714 (2007) (internal citations and quotations omitted).

"If the claims asserted, though frivolous, are within policy coverage, the insurer must defend irrespective of ultimate liability." *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985).  "A declaration that an insurer is without obligation to defend a pending action could be made only if it could be concluded as a matter of law that there is no possible factual or legal basis on which [the insurer] might eventually be held to be obligated to indemnify [the insured] under any provision of the insurance policy." *Id.* (internal citations and quotations omitted); *see also Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 141 (2d Cir. 2014) ("[A]n insurer will be called upon

---

[7] The parties' briefs assume that New York law applies here.  That implied consent is sufficient to establish choice of law.  *See Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-7908 (PAE), 2013 WL 2631043, at *2 n.3 (S.D.N.Y. June 11, 2013).

to provide a defense whenever the allegations of the complaint 'suggest . . . a reasonable possibility of coverage.'") (quoting *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137).

It is important to emphasize here that the test is whether the claims asserted in an underlying action have a reasonable possibility of *coverage* under the policy.  *See, e.g.*, *Servidone Constr. Corp.*, 64 N.Y.2d at 424 ("If the claims asserted, though frivolous, are within policy coverage, the insurer must defend irrespective of ultimate liability."); *Schwamb v. Fireman's Ins. Co. of Newark, N.J.*, 41 N.Y.2d 947, 949 (1977) ("So long as the claims, even though predicated on debatable or even untenable theory, may rationally be said to fall within policy coverage, whatever may later prove to be the limits of the insurer's responsibility to pay, there is no doubt that it is obligated to defend.").  The test should not be conflated with whether there is a reasonable possibility that the underlying case has merit.  That is not the inquiry for a court when evaluating an insurer's duty to defend.

"New York courts look to two sources of information to determine whether there is a possible factual or legal basis for an obligation to defend."  *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 323 (S.D.N.Y. 2020).  "The duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer 'has actual knowledge of facts establishing a reasonable possibility of coverage.'"  *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997) (quoting *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 67 (1991)).

"First, the analysis may focus on the four corners of the underlying complaint."  *Zurich Am. Ins. Co. v. XL Ins. Am., Inc.*, 547 F. Supp. 3d 381, 397 (S.D.N.Y. 2021), *opinion corrected on reconsideration,* 556 F. Supp. 3d 301 (S.D.N.Y. 2021).  Importantly, it is "the facts which are pleaded, not the conclusory assertions," that determine whether there is a duty to defend.  *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 162 (1992).  "Unsubstantiated speculation about facts that may be alleged or adduced in the underlying litigation does not trigger a duty to defend."  *Spandex House, Inc. v.*

21

*Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 249 (S.D.N.Y. 2019), *aff'd*, 816 F. App'x 611 (2d Cir. 2020) (internal quotation and citation omitted).

"Second, '[e]ven where a complaint itself does not suggest the possibility of coverage, the insurer nevertheless has a duty to defend if facts outside the complaint suggest that the claim is within the scope of the relevant insurance policy.'" *XL Ins. Am.*, 547 F. Supp. 3d at 397 (quoting *Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*, 122 F. Supp. 3d 44, 49 (S.D.N.Y. 2015)). "[A]n insured's right to a defense should not depend solely on the allegations a third party chooses to put in the complaint. This is particularly so because the drafter of the pleading may be unaware of the true underlying facts or the nuances that may affect the defendant's coverage and it might not be in the insured's (or the insurer's) interest to reveal them." *Fitzpatrick*, 78 N.Y.2d at 68. An insurer has a duty to defend if "underlying facts made known to the insurer create a reasonable possibility that the insured may be held liable for some act or omission covered by the policy." *Id.* at 70 (internal quotation marks omitted).

The underlying complaint is "the significant and usual touchstone for determining" an insurer's duty to defend, but its allegations are not "controlling." *Fitzpatrick*, 78 N.Y.2d at 68. The insurer must also consider "judicial admissions in the insured's responsive pleadings in the underlying tort action or other formal submissions in the current or underlying litigation to confirm or clarify the nature of the underlying claims." *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 635 (1997). That includes allegations pleaded in the underlying action by the plaintiff in the coverage action. *All State Interior Demolition Inc. v. Scottsdale Ins. Co.*, 92 N.Y.S.3d 256, 257 (1st Dep't 2019).

"If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be." *Euchner-USA*, 754 F.3d at 141 (internal quotation marks omitted). "Even where there exist extrinsic facts suggesting that the claim may ultimately prove meritless or outside the policy's coverage, the insurer

cannot avoid its commitment to provide a defense, since '[a] complaint subject to defeat because of debatable theories . . . must [nevertheless] be defended by the insured.'" *Fitzpatrick*, 78 N.Y.2d at 66 (quoting *Int'l Paper Co. v. Cont'l Cas. Co.*, 35 N.Y.2d 322, 326 (1974)).

"Any doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier." *Euchner-USA*, 754 F.3d at 141  "[W]here the theory of liability on which the injured party is proceeding cannot be determined from the facts pleaded, the insurer must defend.  But where it can be determined from the factual allegations that no basis for recovery within the coverage of the policy is stated in the complaint, [a court] may sustain [the insurer's] refusal to defend." *Allstate Ins. Co.*, 79 N.Y.2d at 162–63 (internal quotations and citations omitted).  "[A]n examination of whether an insurer has a duty to defend must focus on the information made available to the insurer and the insurer's actual knowledge at the time a request for a defense was tendered in light of the language of the policy." *Massachusetts Bay Ins. Co. v. Penny Preville, Inc.*, No. 95-cv-4845, 1996 WL 389266, at *5 (S.D.N.Y. July 10, 1996).  "This standard applies equally to additional insureds and named insureds." *Regal Const. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 15 N.Y.3d 34, 37 (2010).

The duty to defend is a lasting obligation that continues "until it is determined *with certainty* that the policy does not provide coverage." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 (2d Cir. 2001).

> There are at least three kinds of uncertainty that can give rise to such a duty to defend.  The first is factual:  did the injury occur in a time, place, or way that is covered by the policy?  The second is legal:  will the cases governing the insurance policy be read to impose coverage in a given situation?  The third arises from the existence of *contra proferentem*:  will the terms of the contract of insurance be deemed to give rise to an ambiguity that must be read against the insurer or will they be held to be clear enough to avoid the presumption?  Each of these uncertainties will ultimately be resolved by courts or juries—and often in favor of the insurer, thereby precluding coverage and the duty to indemnify.  But until they are, the insurer cannot avoid its duty to defend.

23

*Id.* "Under some circumstances, the allegations contained in the complaint against the insured will by themselves eliminate all potential doubt and relieve the insurer of any duty to defend." *Id.* at 621 (citing *George Muhlstock & Co. v. Am. Home Assurance Co.*, 502 N.Y.S.2d 174, 179 (1st Dep't 1986) ("[W]here the facts alleged plainly do not bring the case within the coverage of the policy, there is no obligation to defend.")).

### D.    Coverage of an Additional Insured

The parties' dispute in this case turns on whether each of the Original Defendants qualifies as an "additional insured" under the Travelers Policy and the Selective Policy. The answer to that question turns on the language of each policy.

The Travelers Policy provides coverage for bodily injury "caused by acts or omissions of" J&S, Travelers's named insured. Travelers Policy at TRV00148. The Selective Policy contains equivalent language, providing additional insured's coverage on with respect to bodily injury "caused, in whole or in part" by the "acts or omissions" of Williams, Selective's named insured. Selective Policy at SELECTIVE_000225–226.[8] The meaning of this language, as contained in the Travelers Policy and the Selective Policy, is "well settled as a matter of New York law." *Ohio Sec. Ins. Co. v. Travelers Indem. Co. of Conn.*, No. 19-cv-1355, 2021 WL 797670, at *3 (S.D.N.Y. Mar. 1, 2021) (Nathan, J.) (citing *Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 29 N.Y.3d 313, 317 (2017)). "[W]here

---

[8] The Selective Policy contains a separate "Blanket Additional Insured" provision. Selective Policy at SELECTIVE_000232. Under that provision, an additional insured would become an additional insured "with respect to liability *arising out of* your ongoing operations performed under that contract, agreement, or permit when that contract, agreement, or permit requires the additional insured be added with respect to the liability arising out of your ongoing operations" *Id.* (emphasis added). If the underlying agreement does not require that a person be insured for bodily injury "arising out of" the named insured's conduct, "then such person or organization is an additional insured only with respect to 'bodily injury' . . . caused in whole or in part by your ongoing operations performed under that contract, agreement, or permit." *Id.* The New York Court of Appeals has "interpreted the phrase 'arising out of' in an additional insured clause to mean 'originating from, incident to, or having connection with." *Regal Const. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 15 N.Y.3d 34, 38 (2010). "'[A]rising out of' is not the functional equivalent of 'proximately caused by.'" *Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 29 N.Y.3d 313, 324 (2017). Instead, it has been equated with "but for" cause. *Id.*; *see also Emps. Ins. Co. of Wausau v. Harleysville Ins. Co. of New York*, 759 F. Supp. 3d 344, 352 (E.D.N.Y. 2024), *appeal withdrawn*, No. 25-1530, 2025 WL 2656354 (2d Cir. Sept. 16, 2025). Because the Court finds that there is a duty to defend applying the more constrained proximate causation standard, the Court does not separately analyze whether coverage exists under the more lenient "but-for" causation standard.

24

an insurance policy is restricted to liability for any bodily injury 'caused . . . ' by the 'acts or omissions' of the named insured," as here, "the coverage applies to injury proximately caused by the named insured." *Burlington Ins. Co.*, 29 N.Y.3d at 317. Thus, insurance provisions with this language only "protect additional insureds from vicarious liability for the named insured's negligence." *Ohio Sec. Ins. Co.*, 2021 WL 797670 at *3 (citing *Burlington Ins. Co.*, 29 N.Y.3d at 326).

## III.    DISCUSSION

### A.    There Is a Reasonable Possibility that the Conduct of J&S and Williams Caused the Accident

Mr. Ramos's deposition testimony provided sufficient information to trigger a duty to defend by Travelers and Selective. Mr. Ramos testified that the debris left behind at his job site were "problems" that caused his fall. *See, e.g.*, Second Deposition 262:11–16 ("Q: So my question is this: Was garbage left by the plumbers one of the problems that caused you to fall from the ladder? MR. RAMOS: Well, yes, that and all the other things that were there."). Mr. Ramos testified that the debris consisted of pipes left behind by the plumbers and cables left behind by the electricians. *See, e.g.*, First Deposition at 63:10–64:12 ("MR. RAMOS: The problem was that the site where I was working it has -- there was a lot of problems. Q: What were the problems? MR. RAMOS: So there was a lot of dirt. The electricians had left cables and the plumbers had left garbage, too. It was a lot. It was a lot of things."). Mr. Ramos's testimony that the job site was left unsafe by contractors who left cables and pipes there was amply supported by photographic evidence showing that the floor of his worksite was littered with cables and hemmed in by pipes.

In addition to Mr. Ramos's direct testimony that the garbage left by the plumbers and the other detritus caused him to fall, Mr. Ramos testified that he was injured because he fell on top of the tubes left on the job site, rather than the floor. First Deposition 80:19–23 ("Q: And what did you land on; concrete, the concrete floor or something else? MR. RAMOS: I fell on the top of the

tubes, the concrete tubes, that they were there."). So, his testimony supports the inference that his injury was exacerbated as a result of the materials that were left on the job site.

Although Mr. Ramos did not see either J&S or Williams at his work site, there is no evidence that any other electrical or plumbing subcontractor was working on that job—J&S and Williams represented those trades on the Project. *See generally* J&S Subcontract; Williams Subcontract. Pursuant to the terms of each of their respective subcontracts, J&S and Williams were required to "keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Subcontract." J&S Subcontract § 4.5; Williams Subcontract § 4.5. The evidence presented at Mr. Ramos's deposition indicated that they failed to do so, contributing to his accident and injuries.

Travels and Selective cannot avoid their duty to defend because other evidence rebuts the claim that Williams and J&S caused the accident. They point, for example, to this emblematic exchange with Mr. Ramos: "Q: So do you know if the ladder fell because it was on top of a pipe left by the plumber? MR. RAMOS: I don't know." Second Deposition 262:23–263:2. And they also note that Mr. Ramos testified that he made efforts to clear the floor as he set up his ladder. *Id.* 254:17-255:8. They take the position that such evidence eliminated the possibility of coverage. Selective's reply brief advances a summary of its and Traveler's view:

> What Ohio Security ignores, however, is the wealth of extrinsic evidence—including other testimony by Ramos himself—that eliminates the possibility of any connection between Williams' operations at the construction site and Ramos's injury . . . . As such, there is simply no basis upon which a reasonable factfinder could determine that the School Street Defendants' liability somehow arose out of Williams' operations.

Dkt. No. 60 ("Selective Reply") at 1.

However, it is well-established that the existence of extrinsic evidence that undermines a claim does not negate an insurer's duty to defend. "Even where there exist extrinsic facts suggesting that the claim may ultimately prove meritless or outside the policy's coverage, the insurer cannot

avoid its commitment to provide a defense, since '[a] complaint subject to defeat because of debatable theories . . . must [nevertheless] be defended by the insured.'" *Fitzpatrick v. Am. Honda Motor Co.,* 78 N.Y.2d 61, 66 (1991) (quoting *Int'l Paper Co. v. Cont'l Cas. Co.*, 35 N.Y.2d 322, 326 (1974)). The duty to defend is determined "without regard to the insured's ultimate likelihood of prevailing on the merits of a claim." *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 16 N.Y.3d 257, 264 (2011). "[A] defense obligation may be avoided only where there is 'no possible factual or legal basis' on which an insurer's duty to indemnify under any provision of the policy could be held to attach." *Century 21, Inc. v. Diamond State Ins. Co.,* 442 F.3d 79, 82-83 (2d Cir. 2006) (quoting *Servidone Constr. Corp.,* 64 N.Y.2d at 424).

Parts of Mr. Ramos's testimony were arguably inconsistent with the claim that J&S and Williams' conduct caused his accident. But any such contradictions in the evidence undermine the likelihood of an ultimate finding of liability—not, as Selective and Travelers argue, whether the duty to defend was triggered. The duty to defend is triggered by the likelihood of *coverage*, not the likelihood that a finder of fact will ultimately find liability. Because Mr. Ramos also testified that the failure by J&S and Williams to clear the worksite caused his accident, his testimony establishes a reasonable possibility that the Original Defendants are covered as additional insureds under both the Selective Policy and the Travelers Policy.

Nor is Selective and Travelers's duty to defend extinguished because of the possibility that Jan, the company for which Mr. Ramos worked and Ohio Security's named insured, may also ultimately be found liable. That is because "there may be more than one proximate cause of an injury." *Argentina v. Emery World Wide Delivery Corp.*, 93 N.Y.2d 554, 560, n. 2 (1999).

Selective and Travelers misread *Worth Constr. Co. v. Admiral Ins. Co.*, 10 N.Y.3d 411 (2008) as governing the outcome here. In *Worth*, the New York Court of Appeals reversed a lower court's decision that the mere fact that a plaintiff's "injury was sustained on the stairs" sufficed to establish that insurer of the company that had installed the stairs had a duty to defend against the plaintiff's

27

claim. *Id.* at 415. The Court of Appeals described the staircase as "merely the situs of the accident." *Id.* at 416. What Selective and Travelers omit from their analysis of *Worth* is that the plaintiff in that case "admitted that its claims of negligence against [the company that installed the staircase] were without factual merit . . . ." *Id.* ("Once Worth admitted that its claims of negligence against Pacific were without factual merit, it conceded that the staircase was merely the situs of the accident. Therefore, it could no longer be argued that there was any connection between Murphy's accident and the risk for which coverage was intended."). There is no equivalent concession here. Instead, the Original Defendants allege that J&S and Williams were responsible for the accident. This is not a case in which it has been definitively determined that the only connection of the named insureds to the claim was that they worked at the "situs of the accident." Therefore, *Worth* is distinguishable.[9]

For similar reasons, this case is distinguishable from *Brown v. Two Exch. Plaza Partners*, 539 N.Y.S.2d 889 (1st Dep't 1989), *aff'd,* 76 N.Y.2d 172 (1990). There, the First Department concluded that the company that erected a scaffold where an accident occurred several days prior was not liable under a contract for indemnification. The First Department reasoned as follows: "But to say, as Fuller does, that plaintiff's accident arose out of, in connection with or as a consequence of Heydt's erection or straightening of the scaffold, without any showing of a particular act or omission in the performance of such work causally related to the accident, would be to make Heydt a virtual insurer of the scaffold." *Brown*, 539 N.Y.S.2d at 892. Here, by contrast, there is a showing that the failure of J&S and Williams to clean the worksite—a duty that they were contractually obligated to perform—was causally related to the accident.[10]

---

[9] Selective and Travelers also ignore the language in *Worth* that runs contrary their argument. *See Worth Const. Co. v. Admiral Ins. Co.*, 10 N.Y.3d 411, 416 (2008) ("Generally, the absence of negligence, by itself, is insufficient to establish that an accident did not 'arise out of' an insured's operations. The focus of a clause such as the additional insured clause here 'is not on the precise cause of the accident but the general nature of the operation in the course of which the injury was sustained."") (internal citations omitted).

[10] While Selective cites to *Brown* in support of its argument that it does not have a duty to defend, *Brown* was presented to the court in a very different posture than this case. First, the court was not asked to evaluate whether an insurer had a duty to indemnify, but was opining on a party's contractual indemnification obligations. Second, the opinion was based on a review of the evidence presented at a trial, rather than in the context of a motion for summary judgment.

Instead, this case is analogous to the First Department's more recent opinion in *All State Interior Demolition Inc. v. Scottsdale Ins. Co.*, 92 N.Y.S.3d 256 (1st Dep't 2019). As here, *All State* involved a third-party complaint asserted against a contractor. The contractor's insurer disclaimed its duty to defend because, it asserted, the injury was not caused by the actions or omissions of its named insured, "and the complaint in the underlying action contains no allegations of negligence against [that contractor], which was not even named as a defendant." *Id.* at 257. The First Department considered the pleadings, which "implicate United's demolition actions, alleging, for example, that the plaintiff was injured when he stepped on 'construction debris and materials consisting of concrete and demolition remains.'" *Id.* The court concluded that the allegations were sufficient to trigger the insurer's duty to defend. In a parallel to the Court's holding in this case, the First Department concluded its analysis with the following remarks:

> Even if there were issues of fact whether the underlying plaintiff was working for United, as Scottsdale contends, Scottsdale would have a duty to defend All State in the underlying action, because it failed to establish that there is no possibility that it will be obligated to do so.

*Id.* at 258.

Here too, Selective and Travelers have failed to establish that there is no factual or legal basis on which their duty to indemnify could be held to attach. In its briefing, Ohio Security highlights the fact that neither J&S nor Williams have moved to dismiss the claims against them in the Underlying Action. *See, e.g.*, Ohio Mem. at 25. Nor have they moved for summary judgment. The fact that J&S and Williams have not yet done so does not by itself establish that there is a possibility of coverage in the Underlying Action. But it does bear emphasis that if J&S and Williams believe that there is no admissible evidence that would support a finding of liability, they have the option to

make an appropriate motion in the Underlying Action. This insurance coverage dispute is not an alternative forum to litigate the sufficiency of the evidence supporting the claims against them.[11]

### B.    Travelers and Selective Do Not Dispute the Relative Priority of their Policies

Ohio Security argued that the Selective Policy is primary to the Ohio Security Policy and the Travelers Policy, which, in turn, must share any defense costs ratably. Travelers and Selective have not opposed that argument. Therefore, Ohio Security's motion for declaratory judgment regarding the relative priority of the three insurance policies at issue in this case is granted.

Federal Rule of Civil Procedure 56 "does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v. Federal Express*, 766 F.3d 189, 194 (2d Cir. 2014). Before granting an unopposed summary judgment motion, "the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Id.* "And, of course, the court must determine whether the legal theory of the motion is sound." *Id.* "To sum up, when a party, whether *pro se* or counseled, fails to respond to an opponent's motion for summary judgment, a district court may not enter a default judgment." *Id.* at 197. "Rather, it must examine the movant's statement of undisputed facts and the proffered record support and determine whether the movant is entitled to summary judgment." *Id.*

Rule 56 "requires that a grant or denial of summary judgment is accompanied by an explanation." *Id.* at 196. "However, absent some indication of a material issue being overlooked or an incorrect legal standard being applied, [the Second Circuit does] not require district courts to write elaborate essays using talismanic phrases." *Id.* at 196–97. When a counseled party elects not

---

[11] Because Mr. Ramos's testimony at his first deposition triggered a duty to defend, the Court need not resolve the alternative arguments advanced by Ohio Security that the third-party complaints and the bills of particulars served by Mr. Ramos on J&S and Williams triggered a duty to defend.

to oppose a motion for summary judgment, "there is no need for a district court to robotically replicate the defendant-movant's statement of undisputed facts and references to the record . . . ." *Id.* at 197. "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Id.* at 198.

Because Selective and Travelers are represented by capable counsel who engaged actively in briefing the other issues in this action, the Court infers that they have abandoned any defense to Ohio Security's motion for declaratory judgment with respect to the relative priority of the policies. The legal theory supporting Ohio Security's motion is sound. Under New York law, when each of two insurance policies "generally purports to be excess to the other, the excess coverage clauses are held to cancel out each other and each insurer contributes in proportion to its limit amount of insurance." *Lumbermens Mut. Cas. Co. v. Allstate Ins. Co.*, 51 N.Y.2d 651, 655 (1980). The Selective Policy states that it is primary, and the other two policies contain general excess coverage clauses. As a result, the Selective Policy is primary. The Ohio Security Policy and the Travelers Policy are excess and, to the extent required, must contribute in proportion to their respective limit amount of insurance.

### C. The Court Lacks Sufficient Information to Order Selective and Travelers to Pay Prior Defense Costs

The Court does not have sufficient information to determine the amount that Selective and Travelers must pay to Ohio Security to reimburse it for prior defense costs. In its motion, Ohio Security requests that the Court grant "a money judgment in favor of Ohio Security and against Selective and Travelers, jointly and severally, in the sum of $27,698.17 plus 9% interest per annum from September 26, 2023, representing the monies paid by Ohio Security for the defense of School Street, 10-28, and Mountco in the Underlying Action . . . ." Ohio Mem. at 29. Ohio Security asserts that the amount represents the amount paid in defense costs "as of December 24, 2024." Holmes

Decl. ¶ 23. Ohio Security did not explain why it believed that Selective and Travelers should be jointly and severally liable for that amount, given its position that the Selective Policy is primary to the Travelers Policy.

Selective opposed that request, arguing that it had no obligation to provide a defense prior to February 14, 2024, the date on which it received notice of the claim. Dkt. No. 54 ("Selective Opp.") at 11. Travelers did not respond to this argument at all. *See generally* Dkt. No. 58. Ohio Security did not reply to Selective's opposition and did not provide an alternative calculation of the amount of defense costs that either Travelers or Selective would owe in light of the dates on which the defense was tendered to them.

The record does not permit the Court to determine the amount, if any, owed by each of Travelers and Selective for Ohio Security's prior defense costs. Therefore, the Court denies Ohio Security's request that the Court order that Selective and Travelers pay Ohio Security $27,698.17. The Court hopes that the parties will be able to determine what amount Selective and Travelers must reimburse Ohio Security for its prior defense, if any, given the Court's ruling regarding the scope of the parties' duty to defend and the relative priority of the policies.

IV.    CONCLUSION

Because the underlying facts suggest a reasonable possibility of coverage, Travelers and Selective have a duty to defend the Original Defendants in the Underlying Action. Accordingly, Ohio Security's motion for summary judgment is GRANTED IN PART, and Selective and Travelers motions for summary judgment are DENIED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 42, 49 and 50.

SO ORDERED.

Dated: May 21, 2026
New York, New York

_____
GREGORY H. WOODS
United States District Judge